**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
Joseph A. Pettigrew (CA 236933)
jpettigrew@scott-scott.com
600 W. Broadway, Suite 3300
San Diego, CA 92101
Telephone: 619-233-4565
Facsimile: 619-233-0508

**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
Jing-Li Yu (CA 342985)
jyu@scott-scott.com
The Helmsley Building, 230 Park Avenue, 24th Floor
New York, New York 10169
Telephone: 212-223-6444
Facsimile: 212-223-6334

*Attorneys for Plaintiff City of Birmingham Retirement and Relief System*

[Additional Counsel on Signature Page.]

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN JOSE DIVISION**

| | |
|---|---|
| CITY OF BIRMINGHAM RETIREMENT AND RELIEF SYSTEM, Derivatively on Behalf of SUPER MICRO COMPUTER, INC.,<br><br>Plaintiff,<br><br>v.<br><br>CHARLES LIANG, DAVID WEIGAND, SARA LIU, and YIH-SHYAN "WALLY" LIAW,<br><br>Defendants,<br><br>– and –<br><br>SUPER MICRO COMPUTER, INC.,<br><br>Nominal Defendant. | Case No.:<br><br>**DEMAND FOR JURY TRIAL** |

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

**TABLE OF CONTENTS**


I. INTRODUCTION ........ 1

II. JURISDICTION AND VENUE ........ 2

III. PARTIES ........ 3

IV. SUBSTANTIVE ALLEGATIONS ........ 4

A. Accounting Manipulation and Premature Recognition of Revenue ........ 4

B. Export Control Violations and Sanction Evasion ........ 12

C. A “Special Committee” Conducted an Inadequate Investigation, Whose Limited Recommendations Were Ignored ........ 14

D. A Securities Class Action Filed in 2025 Further Confirmed the Accounting Fraud that Hindenburg Had Described ........ 19

E. Liaw’s Indictment Further Illustrates How Supermicro’s Directors and Officers Failed to Conduct Compliance Oversight over Export Controls ........ 20

F. The Individual Defendants Engaged in Insider Stock Sales While in Possession of Material, Non-Public Information ........ 28

V. BREACHES OF FIDUCIARY DUTY BY DIRECTORS AND OFFICERS ........ 28

VI. DEMAND WAS WRONGFULLY REFUSED ........ 29

VII. CLAIMS FOR RELIEF ........ 30

COUNT I – BREACH OF FIDUCIARY DUTY (Against the Individual Defendants) ........ 30

COUNT II – UNJUST ENRICHMENT (Against the Individual Defendants) ........ 31

VIII. PRAYER FOR RELIEF ........ 31

IX. JURY DEMAND ........ 32

Plaintiff City of Birmingham Retirement and Relief System ("Birmingham" or "Plaintiff") brings this verified shareholder derivative complaint following an extensive investigation of several sources, including: (i) Super Micro Computer, Inc.'s ("Supermicro" or the "Company") public filings with the U.S. Securities and Exchange Commission ("SEC"), including Forms 10-K, 10-Q, and 8-K from 2021 through 2025; (ii) public statements and earnings calls by Chief Executive Officer ("CEO") Charles Liang ("Liang"), Chief Financial Officer ("CFO") David Weigand ("Weigand"), and other senior executives; (iii) an August 2024 investigative report by Hindenburg Research ("Hindenburg") detailing alleged financial irregularities and sanctions violations; (iv) a whistleblower complaint filed by a former Supermicro compliance manager, detailing the Company's accounting misconduct, *Luong v. Super Micro Computer, Inc.*, No. 5:24-cv-02440 (N.D. Cal.); (v) a securities action, *In re Super Micro Computer, Inc. Securities Litigation*, No. 5:24-cv-06147 (N.D. Cal. filed Aug. 30, 2024); (vi) a criminal indictment against Yih-Shyan "Wally" Liaw ("Liaw"), co-founder of Supermicro, and other Supermicro employees, *United States v. Liaw*, No. 1:26-cr-00100-1 (S.D.N.Y.); (vii) other publicly available information; and (viii) a review of minutes of the Board of Directors ("Board") and related Board materials produced by Supermicro pursuant to Plaintiff's demand for inspection under Section 220 of the Delaware General Corporation Law, 8 *Del. C.* §220 (the "220 Documents").

## I. INTRODUCTION

1. This shareholder derivative action arises from an extended and systemic pattern of misconduct, deception, and abdication of fiduciary responsibility by the senior executives and directors of Supermicro. Over a period spanning from at least 2021 to the present, Defendants (defined *infra*) engaged in and concealed widespread violations of U.S. export control laws, accounting principles, and internal control obligations. Their actions subjected Supermicro to enormous regulatory risk, investor losses exceeding $30 billion, and reputational damage from which the Company may never recover.

2. At the center of the wrongdoing is Supermicro's leadership—co-founders Charles Liang and Sara Liu, Chief Financial Officer David Weigand, and a Board that not only ignored repeated warnings, red flags, and internal reports, but actively enabled and approved materially false public disclosures. Notably, one director, co-founder Wally Liaw, was recently indicted for criminally conspiring to evade export controls. Despite multiple whistleblower complaints, escalating regulatory exposure, and independent investigative reporting, the Board took no meaningful remedial or corrective action. Instead, the Board stood idly by as management manipulated revenue, violated federal law, retaliated against employees, and engaged in undisclosed related-party transactions.

3. These abuses occurred during a time when Supermicro's stock price rose dramatically due to its positioning in the artificial intelligence ("AI") and data infrastructure markets. Investors relied on the Company's assurances about financial controls and compliance posture. Those assurances were false.

4. Plaintiff brings this derivative action on behalf of the Company because, while the harm to the Company is severe, and Supermicro's directors and officers have utterly failed to fulfill their fiduciary duties, and though Plaintiff made a litigation demand to the Board, that demand has been wrongfully refused through long inaction.

## II. JURISDICTION AND VENUE

5. This Court has jurisdiction over this action pursuant to 28 U.S.C. §1332 because there is complete diversity between Plaintiff and Defendants and the amount in controversy exceeds $75,000, exclusive of interest and costs. The Court also has supplemental jurisdiction over state law claims under 28 U.S.C. §1367.

6. Venue is proper in this District pursuant to 28 U.S.C. §1391 because Supermicro is headquartered in this District, many of the acts and conduct that constitute the violations of law complained of herein occurred in this District, and Defendants conduct business in this District.

7. **Divisional Assignment**: Under Civil Local Rule 3-2(e), this action should be assigned to the San Jose Division of this Court, as the Company is headquartered in Santa Clara County, California.

## III. PARTIES

8. Plaintiff City of Birmingham Retirement and Relief System is a public pension fund organized under the laws of the State of Alabama with its principal offices in Birmingham, Alabama. Birmingham is a long-term shareholder of Supermicro and has continuously held Supermicro common stock at all relevant times. As a fiduciary responsible for managing retirement assets on behalf of public employees, Birmingham brings this action derivatively in the right and for the benefit of Supermicro to remedy breaches of fiduciary duty, mismanagement, and other misconduct by the Company's current and former directors and officers.

9. Nominal Defendant Super Micro Computer, Inc., is a Delaware corporation with its principal executive offices located at 980 Rock Avenue, San Jose, California 95131. Supermicro develops and sells high-performance server and storage systems, and its common stock trades on the NASDAQ under the ticker symbol SMCI.

10. Defendant Charles Liang is the Company's President, Chief Executive Officer, and Chairman of the Board. He is a co-founder of Supermicro and has served as CEO since 1993. At all relevant times, Liang exercised substantial control over the Company's operations and public disclosures. Upon information and belief, Defendant Liang is a citizen of the State of California.

11. Defendant David Weigand has served as the Company's Senior Vice President and Chief Financial Officer since July 2020. He signed multiple SEC filings at issue in this case and participated directly in the Company's revenue recognition, export compliance, and financial reporting processes. Upon information and belief, Defendant Weigand is a citizen of the State of California.

12. Defendant Sara Liu served as the Company's Senior Vice President of Operations and Worldwide Sales and is married to Charles Liang. She participated in executive-level decisions regarding customer relationships, order fulfillment, and sales strategy. Upon information and belief, Defendant Sara Liu is a citizen of the State of California.

13. Defendant Yih-Shyan "Wally" Liaw is a co-founder of Supermicro and served as Senior Vice President of International Sales. Liaw engaged in related-party transactions with the Company through businesses he controlled or was affiliated with. In March 2026, Liaw was arrested for violating export control laws, and only then did he resign from the Company. Upon information and belief, Defendant Liaw is a citizen of the State of California.

14. The defendants identified above are referred to herein collectively as the "Individual Defendants" or "Defendants."

## IV. SUBSTANTIVE ALLEGATIONS

### A. Accounting Manipulation and Premature Recognition of Revenue

15. In August 2020, Supermicro and its then-CFO, Howard Hideshima ("Hideshima"), settled accounting violations with the SEC. Hideshima had previously been found to engage in accounting manipulation. The SEC found that Hideshima and other Supermicro executives "pushed employees to maximize end-of-quarter revenue, yet failed to devise and maintain sufficient internal accounting controls to accurately record revenue."[1] Supermicro "improperly and prematurely recognized revenue, including by recognizing revenue on goods sent to warehouses but not yet delivered to customers, shipping goods to customers prior to customer authorization, and shipping misassembled goods to customers." *Id.* Supermicro also improperly reduced liabilities accrued to its marketing program to avoid having to recognize expenses unrelated to marketing. Supermicro was fined $17.5 million. Liang, who was separately charged by the SEC, agreed to reimburse Supermicro $2.1 million in stock sale

[1] Press Release, SEC Charges Super Micro and Former CFO in Connection with Widespread Accounting Violations, U.S. Sec. & Exch. Comm'n (Aug. 25, 2020), available at https://www.sec.gov/newsroom/press-releases/2020-190.

profits made during the period of the alleged misconduct. The SEC settlement was the culmination of a long period of turmoil at Supermicro, including being delisted from Nasdaq in 2018. Supermicro was approved for relisting in January 2020.

16. After the accounting scandal that culminated in the SEC settlement, Supermicro claimed to have turned a new leaf. It claimed to have corrected its prior practices and it let go of several high-level executives, including co-founder and Board director Liaw. But, Supermicro did not in fact correct its accounting misconduct, as would become clear in an explosive whistleblower and retaliation lawsuit filed by a former Supermicro executive, Bob Luong ("Luong"),[2] a stockholder report published by Hindenburg in August 2024, and as was made clearer by a securities fraud suit filed in September 2025.

17. Indeed, only months after Supermicro settled with the SEC and made a show of firing employees connected to the accounting scandal, it began to rehire those same employees. Luong alleged, "Beginning in approximately March 2021, [Supermicro and Liang] began to rehire employees associated with the prior unlawful accounting actions" that included Peggy Lin, who was rehired to be the Chief Administrative Officer.[3] Luong alleged that Lin conspired with co-founder Sara Liu and Edmond Liu, Sara's brother, to negotiate with related party Compuware and its CEO, Bill Liang (Charles Liang's brother), "to delay vendor payment and adjust other terms of sale while still allowing early recognition of revenue irrespective of delay in vendor payments."[4]

18. Luong further alleged that Supermicro engaged in improper revenue recognition practices that were similar to the one that it had just been put through the public wringer for, including:

a) recognizing sales before they had been completed;

---

[2] Second Amended Complaint, *Luong v. Super Micro Comput., Inc.*, No. 5:24-cv-02440 (N.D. Cal. Dec. 16, 2024), ECF No. 38 ("SAC").

[3] SAC ¶17.

[4] *Id.*

b) shipping and billing for equipment that was not yet ready for sale or use (e.g., by lacking key components);

c) allowing various practices to skirt internal accounting controls, such as merging employee roles, circumventing internal processes and controls to approve contracts, and refusing to allow personnel to revalue inventory that includes obsolete and missing equipment that should be written off;

d) bringing Sara Liu back to an active management role, though Luong believed that she had previously stepped back from management at the behest of external auditors;

e) having a new CFO, Weigand, who simultaneously serves as CCO. Kevin Bauer, the CFO brought in to reform the Company after its recent scandal, resigned; and

f) allocating more revenues to hardware versus services despite no visible changes in practices and products or services. Luong personally reported incorrect allocations of revenues up the chain, including meeting with Bauer, who in turn met with Liang to discuss the concerns.

19. Luong also alleged that he met with Supermicro's human resources personnel in May 2021. One concern he made a special point of raising was how "individuals directly responsible for many of the violations found by the SEC were being rehired."[5]

20. In January 2022, Luong also refused to approve an accounting change regarding revenue recognition for Supermicro's top four customers "because of his concerns that the change violated SEC accounting rules."[6]

21. Luong also cited internal emails that demonstrated that Liang knew about Supermicro's improper revenue recognition practices, including one from February 2022 where Cenly Chen, a sales executive, copied Liang on an email where she asked "how can we secure and grow our business with the highly valued customers if Supermicro is not able to provide

---

[5] SAC ¶27.

[6] *Id.* ¶28.

service appropriately?" The email further noted that Supermicro had refused to "swap the card in production to help our own quarter end shipment/ rev." Chen stated that this was "a critical matter to Supermicro."[7]

22. On March 8, 2022, Luong "filed an internal complaint . . . formalizing the concerns he had been raising with HR and other management since 2021 regarding the hiring of employees who had engaged in prior unlawful activity."[8] He also filed another internal complaint through another portal, Ethicspoint, raising similar issues.

23. Luong believes that Liang and Supermicro's then auditor, Deloitte, "worked together to cover up Supermicro's accounting manipulations. Plaintiff attended a meeting with Mr. Liang and a Deloitte employee where the Deloitte employee made a joke stating something to the effect that we better get this right or you two will be walking around in 'orange jumpsuits.'"[9]

24. Luong alleged that as he made more complaints, he experienced increasing levels of retaliation, including declines in his compensation, delays in getting resources approved, and disapproval of staff onboarding.

25. In late 2022, the retaliation against Luong escalated from a meeting with Supermicro's legal department in October 2022, then Luong's placement on involuntary administrative leave in mid-October 2022, then involuntary unpaid administrative leave in December 2022, and termination in April 2023.

26. On June 17, 2025, the Court denied defendants' motion to dismiss Luong's whistleblower action.

27. In August 2024, while Luong's lawsuit was still in its initial stages, Hindenburg released an extensive and explosive report alleging widespread accounting and export control violations at Supermicro. Similarly to Luong, Hindenburg alleged that Supermicro continued to

---

[7] SAC ¶29.

[8] *Id.* ¶30.

[9] *Id.* ¶31.

engage in the same type of misconduct that had just led to a major accounting scandal, Nasdaq delisting, and SEC enforcement action. Hindenburg also provided further details concerning Supermicro rehiring employees it had let go for misconduct, sometimes a mere three months after their departures. Hindenburg also alleged that Supermicro officers directed the Company to do business with close relatives' companies, in a way that may not be in the Company's best interests. Furthermore, Hindenburg alleged that Supermicro violated export control laws by exporting goods to sanctioned countries, such as Russia and Iran.

28. Hindenburg discussed four key hires that were fired recently:

a) Co-founder and Defendant Liaw had resigned in January 2018. In 2021, he was rehired as a consultant. By 2023, he had rejoined the Board. Hindenburg quoted executives who implicated Liaw in the misconduct: "If you go back to Wally's team, every one of those [people] has their hand in that mess. You can promise yourself that." Another executive went further: "The stuff I remember that was a little bit more egregious . . . an example, putting stuff on a truck and [that] truck would sit in someone's parking lot for a few days."

b) Phidias Chou, former Senior Vice president of Worldwide Sales, resigned in January 2018, and was rehired some time after. By 2024, he was called "Deputy CEO" at a meeting with Liang at a Taiwanese university.

c) Salim Fidel, former Vice President of Sales, left the Company in March 2018. In October 2020, he was re-hired as Vice President of Business Development and Strategic Sales. A former executive said: "He was involved with the restatement. He was one of the sloppy salespeople. He got fired because he was so aggressive."

d) Howard Hideshima, the former CFO who was charged by the SEC, left in January 2018. In May 2023, he was hired by Ableson Technology, run by Liang's

brother, and which does hundreds of millions of dollars of business with Supermicro every year.[10]

29. Hindenburg also pointed out how Kevin Bauer, the CFO who was hired in January 2018 to help clean house, and succeeded in getting the Company relisted in January 2020, was likely "edged out[.]" Hindenburg reported one sales director stated that while "the SEC probably liked" Bauer, Supermicro "worked" the SEC by retaining Bauer, but afterwards, "they cut his head." Weigand succeeded Bauer in the CFO role, who "doesn't seem" to be "pushing for the same level of transparency" as Bauer.

30. Hindenburg also reported that numerous employees told it that Supermicro's "business culture has not really improved despite the SEC charge over accounting violations[.]" A former senior sales director stated: "I wouldn't take comfort in [rehires of personnel who were let go]. If people were let go because their practices were questionable, to bring them back would give me less comfort. I don't think the behavior of the company in many ways has changed in the 5 years since I started, and I started shortly after that delisting problem." Another sales director told Hindenburg: "They were hired back. And there was a lot of nepotism. I'm speaking freely."

31. Hindenburg also recounted Luong's allegations, including how Supermicro again began to recognize revenue improperly only three months after the SEC resolution.

32. A former salesperson told Hindenburg that Supermicro used distributers, such as Avnet and Tech Data, to ship too much product in a channel stuffing scheme, with sales teams facing "massive pressure" from Liang every quarter: "The fastest way to really build up those numbers is to call Avnet, Tech Data your rep there and say, I need you to tell me you're going to take 50 units. Can you do it?"

---

[10] *See* Super Micro: Fresh Evidence Of Accounting Manipulation, Sibling Self-Dealing And Sanctions Evasion At This AI High Flyer, Hindenburg Rsch. (Aug. 27, 2024), available at https://hindenburgresearch.com/smci/ (the "Hindenburg Report").

33. A former salesperson described the scheme as follows: "Yeah, I mean, forecast me a number. Tell me you need to get these things, stuff. We'll do a partial shipment and we're good. It'll take them 45 days to come up with an idea that something did not happen the way they wanted. And now you have a problem. Accounting problem maybe."

34. Another salesperson pointed out how, in contrast to Supermicro, Dell acted properly in dealing with inventory: "Their demand is too much where if they [Dell] don't have it paid for already, it's not there. All of that stuff is spoken for because it has a check in hand, and Dell is basically already sold it." [Alteration in original].

35. By contrast, Hindenburg quoted from salespersons who told about how Supermicro used Avnet to stuff the channel. One stated, "Super Micro's flexible with their inventory where we can build whatever we want with it. Dell won't let us do that." An Avnet employee stated, "Super Micro is just happy they have the check. We [Avnet] paid for it. And then they're like, you do whatever you want. We got our money." [Alteration in original].

36. Sources also told of how Supermicro would rush shipments out the door as part of the revenue recognition scheme even though the products were incomplete or defective. An employee at one Supermicro customer, Genesis Cloud, stated: "We had massive problems with Super Micro, overpromising [and] under-delivering. Shipping pre-production. They were ever so proud to tell us that they were shipping us the first production release of the Gaudi server or Gaudi 2 server. And when it arrived at our data center . . . [it was a] pre-production, unit, with basic quality firmware, things like that. We had no end of issues with it." [Alterations in original].

37. Another customer employee, who worked at Crusoe AI, told of how, "We ordered that first batch of L40S's, and we had something like a 40% [GPU] card failure rate." Furthermore, "We just literally went through, ripped every server open . . . took every card out, cleaned it off, put it back, and then it worked. And so we're like, hey, guys, did you just not test this? Did you not build them properly? Did they get jiggled in transit? Like, what the hell?" [Alteration in original].

38. Hindenburg also detailed approximately $983 million in payments to suppliers controlled by Charles Liang's brothers, which Hindenburg explained could also be a part of Supermicro's accounting fraud: (1) Ablecom, headed by Liang's younger brother, Steve (Jianfa) Liang, and also part owned by Liang, Sara Liu, and Liaw's sibling; (2) Compuware, headed by another younger brother of Charles Liang, Bill (Jianda) Liang, though Steve Liang held the largest ownership stake. Both Ablecom and Compuware share office space with Supermicro in Taiwan.

39. Supermicro's purchases from Ablecom and Compuware equaled approximately 7% of its total cost of sales. Supermicro's relationship with these companies consists of circular transactions: Supermicro sells components to Ablecom and Compuware to assemble server components, which then sell those components back to Supermicro. Supermicro publicly characterizes these relationships as "contract manufacturing." One former Supermicro sales director characterized these companies as obtaining "free money" from Supermicro. Another described how Supermicro employees were not permitted to explore alternative, readily available suppliers for chassis, which Ablecom purchased 91.9% of for the Company: "There were other manufacturers here domestically that had them but we were not allowed to necessarily go after them because we were getting a better deal with that 'air quotes' through Charles' family in Taiwan to do that." Furthermore, Hindenburg found from export records that 99.8% of Ablecom's exports to the United States since 2020 were to Supermicro, while Compuware's U.S. exports during that period were 99.7% to Supermicro. Furthermore, Supermicro may be passing off some of Ablecom's proprietary technology concerning "liquid cooling" as its own.

40. Hindenburg further detailed undisclosed payments made to other Liang relatives: (1) another Liang brother, James, owns two Taiwanese companies (Aeon Lighting and Aeon Biotech) that also supply components to Supermicro and also shares office space; and (2) Bill Jiang part owns and manages Ablestnet Technology Limited and Ablestnet Computer Inc., the latter of which also part owns Compuware. The Ablestnet companies, like Ablecom and

Compuware, appear to be suppliers for or resellers of Supermicro products, and operate from the same facilities as Compuware.

41. Hindenburg also disclosed another circular deal where Supermicro invested in Lambda Labs, ostensibly to buy Nvidia GPUs, but as the former business head at Lambda told Hindenburg, the deal was circular because he'd "never heard of" Lambda "using anyone else but Super Micro."

42. Hindenburg also revealed how Compuware, Ablecom, and Supermicro announced they would invest in Leadtek Research, a small Taiwanese company, but instead appeared to take whatever funds raised for Leadtek for themselves. Ablecom and Compuware also were the largest outside investors of Leadtek, holding, respectively, 19.8% and 9.93% ownership shares of Leadtek. Moreover, Leadtek also buys components from those three companies.

**B. Export Control Violations and Sanction Evasion**

43. The August 2024 Hindenburg Report also described extensive export control violations, including evading sanctions imposed on Russia for its invasion of Ukraine.

44. In 2006, Supermicro had pleaded guilty to one felony count of exporting computer components to Iran in 2001 and 2002 in violation of U.S. export control laws. Despite this guilty plea, Hindenburg found that Supermicro continues to violate export control laws.

45. Since Russia invaded Ukraine in February 2022, the United States has imposed increasing sanctions and export controls against Russia. Supermicro has publicly stated that it has halted sales to Russia to comply with export controls and sanctions.

46. But, according to Hindenburg's analysis of more than 45,000 import and export transactions by trade aggregator Tradesparq, Supermicro has actually increased its exports to Russia since 2022—more than triple the sales before the Russia-Ukraine war (from under $61 million to about $210 million). Moreover, the data likely undercounts the value of the exports, which depend on declared customs values. Though Supermicro no longer makes direct exports to Russia,10 third-party exporters handled about two thirds of exports for Supermicro and about

220 other entities have handled the rest. The largest exporters are based in Turkey, China, and the United Arab Emirates.

47. Though the United States government, through the Bureau of Industry and Security ("BIS"), has issued many warnings to companies to improve due diligence and export control laws, regulations, and restrictions, Supermicro has appeared to disregard them. Tradesparq data, according to Hindenburg's analysis, shows that since February 2022, a web of at least 235 exporters and 185 importers have been shipping Supermicro parts into Russia. At least 17 of these exporters and another 17 importers are subject to U.S. Treasury Office of Foreign Assets Control ("OFAC") blocking sanctions. Another 11 exporters and one importer feature on the BIS parties of concern or entity list. Together, these entities export about $44.5 million of Super Micro products to Russia, and have imported about $80.5 million of Super Micro product into Russia. About two thirds of the exports correspond to "high priority" components that the Russian military have been diverting to the battlefield.

48. According to Hindenburg, Russia-based Niagara Computers has been importing at least $46.5 million of Super Micro products since the start of the Russia-Ukraine war. Hindenburg found that Supermicro has been exporting products to Niagara through third parties, such as a California company called Business Development International, and later, through a few Turkish companies. Hindenburg also found that another Supermicro partner, Beiliande, has exported more than $10 million of Supermicro parts to Russia. Another $30 million of Supermicro products were shipped to Russia's largest importer of dual use civilian-military chips through a Hong Kong entity.

49. Hindenburg also found that Supermicro has sold about $196 million of products to a joint venture it runs with a Chinese state-run company, Fiberhome Technologies Group, since 2020 when the Chinese majority owner was put on the BIS watchlist for activities possibly violating the human rights of the Xinjianese people. Supermicro's Chinese joint venture appears to be supplying a state-run military force that has been placed under U.S. sanctions since July 2020, which means all U.S. entities are prohibited from doing business with it.

**C.** [redacted]

50. [redacted]

51. [redacted]

52. [redacted]

53. [redacted]

54. [redacted]

55. [redacted]

56. [redacted]

57. [redacted]

58. [redacted]

59. [redacted]

60. [redacted]

61. [redacted]

62. [redacted]

63. [redacted]

64. [redacted]

65. [redacted]

66. [redacted]

67. [redacted]

68. [redacted]

69. [redacted]

70. [redacted]

71. [redacted]

72. [redacted]

[redacted]

73. [redacted]

### D. A Securities Class Action Filed in 2025 Further Confirmed the Accounting Fraud that Hindenburg Had Described

74. In 2025, a securities class action provided further details concerning the accounting fraud prevalent at Supermicro by quoting various former employees.[11] These former employees detailed how Liang was personally involved in the aggressive revenue recognition practices. For example, they discuss how Liang threatened employees who sought to write down or write off inventory. Human resources was not a recourse because Sara Liu, Liang's wife and Supermicro co-founder and fellow Board director, ran that function.

75. One former employee, who worked at Supermicro from March 2024 to July 2025, described how a sales operation employee was responsible for inputting Supermicro's sales revenue into an Excel worksheet. This employee was supposed to transition his role to the former employee. That employee relayed how he would have weekly meetings with Liang, where Liang would change the sales revenue numbers in the Excel sheet. Indeed, the former employee was told by the sales employee that Liang preferred Excel sheets instead of a more sophisticated data management system precisely because Excel sheets could be edited. The former employee "described Supermicro as the most unethical company, said it was run like the Wild West, and explained that he had never seen anything like it in his career."[12]

---

[11] Consolidated Amended Complaint for Violations of Federal Securities Laws, *In re Super Micro Computer Inc. Securities Litig.*, No. 5:24-cv-06147-EJD (N.D. Cal. Sep. 22, 2025), ECF No. 176 ("Am. Compl.") (the "Securities Action").

[12] Securities Action Am. Compl. ¶48.

76. The Securities Action describes other former employees who further described Liang's detailed involvement in managing the Company, especially as it came to how the Company recognized revenues. They described how Liang would insist that he personally sign off on even small transactions, and how employees would line up in front of his office so that they could personally explain what they were seeking sign-off for and present paperwork for Liang's inked signature. These former employees also described, in further detail, Supermicro's extensive rehiring of employees who had been let go in connection with the earlier accounting scandal. One of these employees was Luong, who spoke to the plaintiff in the Securities Action, in addition to having filed his own lawsuit.

### E. Liaw's Indictment Further Illustrates How Supermicro's Directors and Officers Failed to Conduct Compliance Oversight over Export Controls

77. Most recently, Liaw was charged with criminally conspiring to sell restricted equipment to China, which further reflected a weak compliance system in Supermicro, which Liaw and his co-conspirators easily evaded or pressured, so that they could continue their illicit scheme for almost two years without getting caught and generated an outside portion of the Company's total profits.

78. On March 17, 2026, an indictment by the U.S. Attorneys' Office for the Southern District of New York against Defendant Liaw, Supermicro employee Ruei-Tsang "Steven" Chang ("Chang"), and Supermicro consultant Ting-Wei "Willy" Sun ("Sun"), was unsealed. *United States v. Liaw*, No. 1:26-cr-00100-ER (S.D.N.Y. Mar. 17, 2026), ECF No. 2 ("Unsealed Indictment"). It detailed a scheme by Liaw, Chang, and Sun to divert servers containing chips from Nvidia to China, where export controls forbid those chips from being sold:

> Beginning in or about 2024, certain executives, employees, and third-party affiliates of a U.S.-based manufacturer [i.e., Supermicro] that designs and builds high-performance computer servers for artificial intelligence and cloud computing applications . . . , including [Liaw, Chang, and Sun], the defendants, conspired to divert billions of dollars' worth of [Supermicro's] servers to China, many of which were assembled in the United States. [Supermicro's] flagship products—servers integrating graphics processing units ("GPUs") manufactured by Nvidia Corporation ("Nvidia")—are subject to strict U.S. export controls barring their sale to China without a license. Those controls are in place to protect U.S. national security and foreign policy interests, among other things.

> The defendants and their-conspirators used a particular company ("Company-1") based in Southeast Asia as a pass-through entity to give the U.S. Manufacturer's transactions that they arranged the appearance of legitimate commercial activity and to obscure their China-based end customers. [Liaw, Chang, and Sun] worked with and directed executives of Company-1 to submit purchase orders to [Supermicro] to reserve and purchase large allocations of the servers from [Supermicro] containing Nvidia GPUs and coordinate their onward transshipment to China. To ensure that the allocations were approved internally at the U.S. Manufacturer, the defendants and executives at Company-1 prepared false documents and records, and transmitted false communications, purporting to show that Company-1 was the end user of the servers. Once Company-1 received the servers, at the direction of and in coordination with the defendants and others, including third-party brokers who worked closely with the defendants to order the [Supermicro's] servers for customers in China, it shipped them to those customers in China. In furtherance of the scheme, Company-1, in consultation with the defendants, used a shipping and logistics company to repackage the U.S. Manufacturer's servers and place them in unmarked boxes to conceal their content prior to shipping them to their final destinations in China.
>
> The defendants and their co-conspirators took extensive measures to conceal their scheme. For example, to deceive [Supermicro's] compliance team, which was responsible for conducting audits of Company-1's purchases of servers to ensure adherence to U.S. export control laws, the defendants staged "dummy" servers—non-working, physical replicas of [Supermicro's] servers—for inspection at the locations where Company-1 was purportedly storing the servers it had purchased from [Supermicro]. However, the actual servers from [Supermicro] had been unlawfully shipped to China. When questions were raised about Company-1's purchases of [Supermicro's] servers, the defendants used encrypted messaging applications to exchange draft responses containing false information about Company-1's sales and operations. Notwithstanding those questions, the defendants pressured certain of [Supermicro's] compliance team members to authorize the shipment of servers to Company-1, knowing that the servers would then be secretly diverted to China.
>
> [Supermicro] profited significantly from the sale of servers to Company-1. Since in or about 2024, the defendants and their co-conspirators caused the sale of at least approximately $2.5 billion worth of [Supermicro's] servers to Company-1, the payments for which transited through financial institutions in the Southern District of New York. A substantial portion of that revenue came from the sale to Company-1 of [Supermicro's] servers that were assembled in the United States and subsequently diverted to China. By way of example, as a result of the defendants' scheme, between late April 2025 and mid-May 2025 alone, over approximately $510 million worth of [Supermicro's] servers assembled in the United States with Nvidia GPUs—and subject to U.S. export controls—were sold to Company-1 and then diverted to China.[13]

79. Around October 2022, under authority delegated by the Export Control Reform Act of 2018 ("ECRA"), BIS placed restrictions on the export of some advanced artificial

[13] Unsealed Indictment at 1–3.

intelligence chips, including Nvidia B200, H100, and H200 graphic processing units ("GPUs") and servers incorporating such chips, such as the ones made by Supermicro, to certain destinations, including China and Hong Kong. And around 2023, BIS tightened those restrictions in exports and reexports to China, imposing new licensing requirements and extending controls to cover indirect transfers to China through other countries, in the interest of national security. U.S. laws and regulations also require specific documentation from Supermicro for exporting goods and technologies from the United States.

80. Supermicro did not have the required license to export restricted Nvidia chips or its servers that contained these chips to China. Thus, Liaw's and his co-defendants' scheme violated the law and potentially also expose Supermicro to criminal legal liability.

81. The indictment showed that Liaw was well aware that what he was doing was illegal. Despite this knowledge, Liaw and his co-defendants enacted a scheme in 2024, took pains to cover up the scheme, and continued to press forward even as they became aware of information that the U.S. government was stepping up both regulatory enforcement and criminal prosecutions for violating these export restrictions.

82. Liaw helped enact this scheme with Chang, because in his role as Senior Vice President of Supermicro (as well as a Board director and a co-founder), Liaw wanted to drive up business for the Company, and Chang (who was Supermicro's general manager in Taiwan) knew there was demand for Nvidia-chip-equipped servers made by Supermicro from Chinese companies. Liaw and Chang worked with Sun, known to be a "fixer" and third-party broker, to enact a scheme where "Company-1" would purchase orders of Supermicro servers that had contained the restricted Nvidia chips, then have the servers, often assembled in the United States, be shipped to Supermicro's Taiwan office, then delivered to "Company-1" in Southeast Asia, and then those servers would be routed to purchasers in China, through a rotation of third-party brokers who worked closely with Liaw, Chang, and Sun.

83. Liaw was chiefly responsible for coordinating order volumes, timing, and GPU allocations. And around June 2024, Liaw recognized how important Company-1's orders were

to helping Supermicro make its own quarterly sales goals, thanking "Individual 1" from "Company-1" for "help for June [2024 sales]" and promising to "help [Company-1] the whole year."[14]

84. Over the course of the scheme, Company-1 became one of Supermicro's largest customers. For the fourth quarter of the 2024 fiscal year, Company-1 was Supermicro's eleventh most profitable customer worldwide, accounting for approximately $99.7 million of revenue that quarter, and its volume of business was comparable to Big Tech hyperscalers who were developing AI infrastructure.

85. The growth in orders from Company-1 prompted Supermicro's compliance team to place a temporary hold on shipments and initiate an audit in October 2024. But as a sign of Supermicro's continued poor internal controls, Liaw and his co-conspirators easily duped Supermicro compliance staff into having the hold removed and passing the audit. Chang conspired with an "Individual-2" from "Company-1" to prevent auditors from physically entering the areas where Company-1 had purportedly kept the servers it had purchased (though, in reality, they had already been diverted to China). Chang also arranged for a "friendly" auditor from Supermicro to perform the audit. At the same time, Liaw pressured Supermicro compliance personnel to "speed this process up" so that Supermicro could resume shipments to Company-1. The hold was soon lifted. Liaw then directed "Individual-1" to put in place purported data center lease agreements to demonstrate that Company-1 justifiably needed the servers it was purchasing "in case [of an] audit letter."[15]

86. Liaw and Chang further understood the weakness of Supermicro's controls because rather than pause or decrease the pace of their scheme, they picked up the pace instead. Toward the end of 2024, Liaw and Chang actually encouraged Company-1 to increase the speed and size of its orders. By early 2025, Liaw and Chang got Sun—one of Liaw's "fixers" since at

---

[14] Unsealed Indictment ¶13.

[15] *Id.* ¶15.

least early 2024—involved so that he could help ramp up the illegal business. During this time, Liaw sent numerous communications to brokers to coordinate these illegal shipments.

87. But also during this period, in early 2025, Liaw and his co-conspirators received various news that put them on further notice that their scheme was illegal:

a. Around January 14, 2025, Liaw sent "Individual-1" a link to a White House press release that announced new export restrictions to take effect around May 13, 2025, with the comment, "We need to speed these [orders] up before May 13!" Liaw texted "Individual-1" with a similar message about how Supermicro "can ship" all the orders "by Feb. Let us run fast before May 13!" Chang texted "Individual-2" a photograph of a pallet for servers that can "ship to China, HK [*i.e.*, Hong Kong] or any countries without any problems."

b. Around March 1, 2025, "Individual-1" texted Liaw a link to a news article about criminal charges filed against people for violating U.S. export controls for illegally moving Nvidia chips to China. When "Individual-1" told Liaw he was "very concerned[,]" Liaw's response was to reassure him that their scheme was more careful about avoiding detection: "They were interviewed by BIS/Singapore. . . . We have not shipped to them for quite a while because BIS U.S. has questioned[.]" Liaw also pushed others to "speed up" the illegal orders.[16]

88. In April 2025, Supermicro's compliance team paused shipments to "Company-1." But despite the regulatory environment and the abnormally high level of orders from "Company-1," the Supermicro compliance team merely paused shipments rather than ordered another audit. Liaw and Chang assisted "Individual-1" in responding to inquiries from Supermicro's compliance staff, who then accepted the responses, and unblocked the account.

---

16 Unsealed Indictment ¶19.

89. Supermicro's compliance function's permissive attitude emboldened Liaw and his co-conspirators. As the indictment describes, "Within days, Company-1's purchase orders to [Supermicro] ballooned. Between in or around late April 2025 and mid-May 2025 alone, Company-1 purchased at least approximately $510 million worth of servers assembled in the United States with Nvidia B200 and H200 GPUs from [Supermicro]. Those servers were then diverted to end customers in China through the defendants' network of brokers."[17]

90. At the same time, Liaw continued to demonstrate that he was aware that what he was directing was illegal, including how in August 2025, one of his brokers sent him a link to a U.S. Department of Justice press release about Chinese nationals being arrested for illegally smuggling chips to China.

91. The huge spike in orders in less than one month (a full fifth of the total orders that the United States alleged occurred over more than a year's period) finally spurred Supermicro's compliance into action by triggering another audit, rather than a mere compliance hold. But Liaw and his co-conspirators were given more than a month's notice of the audit, because the indictment describes how they spent the month of July either discussing the planned audit or preparing an elaborate scheme of stocking Company-1's facilities with "dummy" servers so that they would appear to be used, even when the real servers had already been shipped to China.

92. The audit was finally conducted in early August 2025. The compliance staff were not diligent. Instead, the indictment expressly mentions how the auditing staff in August 2025, who should have been on site conducting inspections, "was instead off-site enjoying entertainment paid for by Company-1[,]" the very company that they were supposed to be inspecting.[18]

93. By then, the U.S. federal government was already onto Liaw's and his co-conspirators' trail. The indictment mentions: "On or about August 20, 2025, BIS informed [Supermicro] that it had reason to believe that Company-1 was diverting [Supermicro's] servers

[17] Unsealed Indictment ¶21.

[18] *Id.* ¶24.

to China, and that BIS therefore had requested a compliance hold on all shipments from [Supermicro] to Company-1." BIS then conducted an inspection in December 2025, and surveillance cameras caught Sun and "Broker-1" attempting to stage "dummy" servers.[19]

94. Despite the ongoing regulatory investigation, Liaw continued to press "Indivudual-1" from "Company-1" to order more servers from Supermicro.

95. In March 2026, Liaw and Sun were arrested and arraigned. Chang remains a fugitive abroad.

96. The recent indictment also demonstrates how Liaw should never have been reinstated at Supermicro to now inflict harm on the Company by destroying its reputation and putting it at risk of being charged with criminal violations of export controls.

97. As described *supra*, [redacted]

98. Predictably, putting a fox back in the henhouse, after it had already been caught, has led to more chickens being slaughtered.

99. Supermicro's stock dropped by up to one-third in the immediate aftermath of this news. The indictment and reporting around it confirmed for the market that despite Supermicro purportedly cleaning up its act, in actuality, Supermicro continued to have inadequate internal controls.

100. In particular, the indictment of Liaw lends credence to the Hindenburg Report, which had flagged both the issue of Liaw's rehiring, after having once been removed for an

---

[19] Unsealed Indictment ¶25.

accounting scandal, and export control violations (though Hindenburg focused on Russia rather than China).

101. For example, the Unsealed Indictment described how repeatedly Liaw, Chang, and Sun were able to evade detection despite Supermicro's own internal audits. Moreover, Supermicro was slow to conduct any audits, despite the unusual order volume from "Company-1," which was on par with Big Tech hyperscalers. Then, when it did conduct audits, it gave the co-conspirators advance notice so they had plenty of time to plan ruses, such as setting up dummy servers. Furthermore, the compliance staff were not diligent—with some of them not working but instead "enjoying entertainment" from the very company that they were tasked with inspecting in August 2025.

102. Further proving how inadequate Supermicro's compliance measures are, this was not merely a small scheme that moved a small amount of equipment. Rather, Liaw's, Chang's, and Sun's scheme resulted in billions of dollars of sales in just the short period in which they successfully carried it out. Between 2024 to 2025, their shell company, through which they placed orders that were diverted to Chinese customers, purchased $2.5 billion worth of servers. In under one month, from late April 2025 to mid-May 2025, $510 million worth of Supermicro's servers were diverted to China in violation of U.S. export control laws.

103. Recent news reports indicate that a Thai company, OBON Corp., is "Company-1" identified in the Unsealed Indictment, and that the servers were routed to Alibaba, a leader in e-commerce, cloud services, and AI development in China.

104. In May 2026, Taiwanese authorities also announced that they were investigating three other persons for smuggling Nvidia-equipped servers manufactured by Supermicro. Taiwanese prosecutors stated that these three persons (to date, identified only by surname) were seeking to purchase the servers in Taiwan and then use false documents to smuggle the servers to China, even though they were aware that U.S. export restrictions blocked such exports. Authorities believe at least one server was successfully smuggled out through Japan to Hong Kong. This latest scandal involving Supermicro servers prompted Nvidia's Chief Executive

Officer, Jensen Huang ("Huang"), to publicly urge Supermicro to tighten its compliance systems. As reported by Bloomberg, Huang stated, "[u]ltimately Super Micro has to run their own company. . . . I hope that they will enhance and improve their regulation compliance and avoid that from happening in the future."

### F. The Individual Defendants Engaged in Insider Stock Sales While in Possession of Material, Non-Public Information

105. Since August 2020, when Supermicro settled charges with the SEC and ostensibly turned over a new leaf, Liang, Liu, and Weigand have engaged in numerous and high-value stock sales even as they possessed material, non-public information that Supermicro indeed continued to commit accounting violations or violated export control laws since they engaged in this very misconduct.

106. Since August 2020, the Individual Defendants have sold the following amount of stock:

- Liang and Liu have jointly sold approximately $93 million of stock;
- Weigand has sold approximately $20 million of stock.

107. These stock sales, while they engaged in misconduct and therefore knew that Supermicro's assurances to the market about its compliance were false, violate their fiduciary duty of loyalty to the Company.

## V. BREACHES OF FIDUCIARY DUTY BY DIRECTORS AND OFFICERS

108. The Individual Defendants violated their fiduciary duties of loyalty, care, and good faith by knowingly allowing systemic misconduct to occur and persist at Supermicro. These breaches exposed the Company to staggering legal, financial, and reputational harm.

109. The Individual Defendants knew or consciously disregarded that Supermicro lacked functioning internal reporting systems concerning revenue recognition, export compliance, and related-party transactions. Indeed, several defendants, including Liang and Liaw, actively participated in and directed the misconduct.

110. Despite the Company's rapid growth in regulated markets, the Board failed to implement any meaningful oversight structure, legal compliance architecture, or escalation protocol for financial or legal risk. The 220 Documents [redacted]

111. Furthermore, the Board has taken very few disciplinary actions in response to the repeated misconduct. As of the filing of this action, Liang remains CEO, Weigand remains CFO, and no Board members have been replaced aside from Liaw. Liaw only resigned after his criminal indictment was unsealed in March 2026. These facts demonstrate that the misconduct alleged herein is not merely historical—it is ongoing. The same individuals responsible for the wrongdoing remain in charge.

## VI. DEMAND WAS WRONGFULLY REFUSED

112. On January 22, 2026, Birmingham made a litigation demand on the Board to investigate the allegations outlined above up to and including the inadequate Special Committee investigation (the "Demand").

113. Since then, for half a year, Birmingham has not heard from the Board.

114. Under Delaware law, a board of directors is required to promptly evaluate a litigation demand. A delay of even one month has been held to be a wrongful refusal of a demand.

115. Here, the delay in response has been half a year. Meanwhile, the issues raised in the Demand are urgent, as evident by the March 2026 indictment of Liaw, another Supermicro officer, and a Supermicro consultant. The indictment illustrates that the Board has done nothing to address the continued poor compliance systems of the Company.

116. Every day in delaying addressing the Demand means the deficient compliance systems at Supermicro creates more and more risk that the Company will again be harmed or ensnared by the illegal or even criminal acts of its employees. Liaw, for example, acted with impunity until he was arrested.

117. Thus, every day of further delay constitutes a continued wrongful refusal of the Demand.

118. As a result, Birmingham files this lawsuit to compel the Board to address its Demand and begin the process of correcting Supermicro's deficient compliance and internal controls.

## VII. CLAIMS FOR RELIEF

### COUNT I – BREACH OF FIDUCIARY DUTY
### (Against the Individual Defendants)

119. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

120. As officers and directors of Supermicro, the Individual Defendants owed fiduciary duties of care, loyalty, good faith, and candor to the Company and its shareholders.

121. The Individual Defendants knowingly, recklessly, or in bad faith breached their fiduciary duties by, among other things:

(a) failing to establish and maintain internal controls sufficient to prevent accounting manipulation, export control violations, related-party conflicts, and whistleblower suppression;

(b) ignoring repeated red flags concerning violations of GAAP and U.S. trade laws;

(d) approving executive compensation tied to tainted performance metrics;

(e) permitting or engaging in insider stock sales while in possession of material, non-public information; and

(f) failing to act after credible internal complaints and external reporting, including the Hindenburg Report and federal investigations.

122. These breaches directly and proximately caused substantial harm to Supermicro, including legal exposure, reputational damage, loss of market capitalization, and impairment of corporate integrity.

123. As a result of these breaches of fiduciary duty, the Individual Defendants are liable to the Company for all damages sustained.

**COUNT II – UNJUST ENRICHMENT**
**(Against the Individual Defendants)**

124. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

125. The Individual Defendants received substantial compensation, bonuses, equity awards, and proceeds from insider stock sales during a period when the Company's financial performance was artificially inflated by misconduct.

126. These benefits were conferred upon them at the expense of Supermicro and its shareholders and would not have been received but for the wrongdoing alleged herein.

127. It would be inequitable under the circumstances for these defendants to retain the compensation and gains derived from their misconduct.

128. Accordingly, the defendants must return all compensation, profits, and other benefits unjustly obtained.

## VIII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of nominal defendant Super Micro Computer, Inc., respectfully requests that the Court enter judgment as follows:

A. Declaring that Plaintiff may maintain this derivative action on behalf of Supermicro and that demand is excused or was otherwise not required;

B. Finding and declaring that the Individual Defendants breached their fiduciary duties to the Company;

C. Finding and declaring that certain Individual Defendants were unjustly enriched at the expense of Supermicro and must return compensation, stock sale proceeds, and other benefits wrongfully obtained;

D. Awarding damages to Supermicro in an amount to be determined at trial, including restitution of ill-gotten gains, compensation overpayments, and other corporate losses caused by Defendants;

E. Ordering disgorgement of all profits, benefits, and compensation obtained by the Individual Defendants as a result of their wrongful conduct;

F. Directing Supermicro to implement comprehensive corporate governance and compliance reforms to prevent a recurrence of the misconduct alleged herein, including, but not limited to:

i. creation of an independent compliance and risk oversight committee;

ii. appointment of a chief compliance officer with direct reporting authority to an independent board committee;

iii. retention of an independent third-party monitor to oversee export compliance and revenue recognition practices;

iv. reform of whistleblower protections and escalation procedures;

v. Board-level review and approval of all related-party transactions; and

vi. clawback policies for incentive-based compensation tied to financial misstatements;

G. Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' fees, expert fees, and other expenses as permitted by law; and

H. Awarding such other and further relief as this Honorable Court deems just and proper.

## IX. JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues so triable.

DATED: June 24, 2026

**SCOTT+SCOTT ATTORNEYS AT LAW LLP**

s/ Jing-Li Yu
Jing-Li Yu (CA 342985)
Donald A. Broggi
The Helmsley Building
230 Park Avenue, 24th Floor
New York, NY 10169
Telephone: 212-223-6444
Facsimile: 212-223-6334
E-mail: jyu@scott-scott.com
dbroggi@scott-scott.com

Joseph A. Pettigrew (CA 236933)
600 W. Broadway, Suite 3300
San Diego, CA 92101
Telephone: 619-233-4565
Facsimile: 619-233-0508
E-mail: jpettigrew@scott-scott.com

Geoffrey M. Johnson (*Pro Hac Vice* Forthcoming)
12434 Cedar Road, Suite 12
Cleveland Heights, OH 44106
Telephone: 216-229-6088
Facsimile: 216-229-6092
E-mail: gjohnson@scott-scott.com

*Attorneys for Plaintiff City of Birmingham Retirement and Relief System*

## VERIFICATION

I, JAY TURNER, do hereby declare:

1. I am the Fund Counsel for the City of Birmingham Retirement and Relief System ("Birmingham"), located in Birmingham, Alabama, and am duly authorized to act on behalf of Birmingham.

2. Birmingham is a derivative plaintiff in the above-titled action. I verify that I have reviewed the Verified Stockholder Derivative Complaint (the "Complaint"), to be filed in this action and that the facts stated in the Complaint, as they concern Birmingham, are true to my personal knowledge. I believe the facts pleaded in the Complaint on information and belief or investigation of counsel are true.

3. Birmingham has not received, been promised or offered, and will not accept any form of compensation, directly or indirectly, for prosecuting this action or serving as a representative party in this action except: (i) such fees, costs, or other payments as the Court expressly approves to be paid to Birmingham; or (ii) reimbursement, by its attorneys, of actual and reasonable out-of-pocket expenditures incurred directly in connection with the prosecution of this action.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on the 24 day of June, 2026.

Jay Turner

Jay Turner, Fund Counsel
City of Birmingham Retirement and
Relief System
Birmingham, Alabama